# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| LEON C. JONES, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:20-CV-797 SRW |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on review of an adverse ruling by the Social Security Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C. § 405(g). The parties have consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in Support of the Complaint. ECF No. 27. Defendant filed a Brief in Support of the Answer. ECF No. 32. The Court has reviewed the parties' briefs and the entire administrative record, including the transcripts and medical evidence. Based on the following, the Court will reverse the Commissioner's denial of Plaintiff's application and remand the case for further proceedings.

## I.     Factual and Procedural Background

On October 25, 2017, Plaintiff Leon C. Jones protectively filed an application for supplemental security income (SSI) under Title XVI, 42 U.S.C. §§ 1381, *et seq.* Tr. 35-36, 77-

---

[1] At the time this case was filed, Andrew M. Saul was the Commissioner of Social Security. Kilolo Kijakazi became the Commissioner of Social Security on July 9, 2021. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name, and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Kilolo Kijakazi for Andrew M. Saul in this matter.

78, 98-99, 168-73. Plaintiff's application was denied on both initial consideration and reconsideration. Tr. 63-76, 79-97, 100-06, 112-14. After being denied on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 115-17.

Plaintiff and counsel appeared for an initial hearing on August 21, 2019. Tr. 32-62. Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. *Id*. The ALJ also received testimony from vocational expert ("VE") Mary Kathleen Schauwecker, M.S., DCMS. Tr. 54-61, 299-02. On September 18, 2019, the ALJ issued an unfavorable decision finding Plaintiff not disabled. Tr. 7-30. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. Tr. 165-66. On May 27, 2020, the Appeals Council denied Plaintiff's request for review. Tr. 1-6. Accordingly, the ALJ's decision stands as the Commissioner's final decision.

With regard to Plaintiff's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses. The Court will discuss specific facts relevant to the parties' arguments as needed in the discussion below.

## II.    Legal Standard

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy[.]" §
1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the
claimant has a disability. 20 C.F.R. § 416.920(a)(1). First, the Commissioner considers the
claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is
not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner
looks to see whether "the claimant has a severe impairment . . . which significantly limits
[claimant's] physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734,
738 (8th Cir. 2010) (quoting 20 C.F.R. § 416.920(c)). "An impairment is not severe if it amounts
only to a slight abnormality that would not significantly limit the claimant's physical or mental
ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also*
20 C.F.R. §§ 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the
impairment's medical severity. If the impairment meets or equals one of the presumptively
disabling impairments listed in the regulations, the claimant is considered disabled, regardless of
age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the
presumptively disabling impairments, the Commissioner assesses whether the claimant retains
the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§
416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as the most a claimant can still do
despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir.
2011); *see also* 20 C.F.R. § 416.945(a)(1). While an RFC must be based "on all relevant

evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016).

Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC, and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). If the ALJ determines the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work which exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work which exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

If substantial evidence on the record as a whole supports the Commissioner's decision, the Court must affirm the decision. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id*. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

## III.   The ALJ's Decision

Applying the foregoing five-step analysis, the ALJ found Plaintiff has not engaged in substantial gainful activity since October 25, 2017.[2] Tr. 12. Plaintiff has the severe impairments of a history of gunshot wounds, migraines, obesity, depression, and anxiety disorder. Tr. 12-13. Plaintiff does not have an impairment or combination of impairments which meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. Tr. 13-15. The ALJ found Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except he could perform work with no more than moderate or office noise. He could understand, remember, and carry out simple instructions and routine tasks consistent with unskilled work. He could perform only simple decision making related to basic work functions. He could tolerate only minor infrequent changes within the workplace. He could tolerate occasional interaction with coworkers and supervisors but in small numbers and for short periods, no tandem tasks, and work is done relatively independently with minimal superficial interaction with the general public.

---

[2] Plaintiff's initial application alleged an onset date of January 25, 2016, but he subsequently amended his onset date to October 25, 2017. Tr. 209.

Tr. 15-23. The ALJ found that Plaintiff was unable to perform his past relevant work. Tr. 23. The ALJ further found Plaintiff was born on October 7, 1973, and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed. *Id*. Plaintiff has at least a high school education and is able to communicate in English. Tr. 24. The ALJ determined the transferability of job skills was not material to the determination of disability because, using the Medical-Vocational Rules as a framework, it supported a finding that the Plaintiff was "not disabled," whether or not he had transferable job skills. *Id*. Relying on the testimony of the VE and considering Plaintiff's age, education, work experience and RFC, the ALJ found there were jobs existing in significant numbers in the national economy which the Plaintiff could perform, including representative occupations such as laundry worker II (*Dictionary of Occupational Titles* ("*DOT*") No. 361.685-018); cleaner hospital (*DOT* No. 323.687-010); marker (*DOT* No. 209.587-034), and mail clerk (*DOT* No. 209.687-026). Tr. 24-25. The ALJ concluded Plaintiff was not under a disability since October 25, 2017, the date the application was filed. Tr. 25.

## IV.    Discussion

Plaintiff challenges the ALJ's decision on two grounds: (1) the ALJ failed to fully and fairly develop the record as to both his mental and physical impairments by not ordering updated consultative examinations; and (2) the ALJ failed to consider Plaintiff's diagnoses of chronic pain after traumatic injury and mild-to-moderate facet arthropathy at Step Two.

### A.  The ALJ's Assessment of Plaintiff's Mental and Physical Impairments

Plaintiff argues the ALJ improperly developed the record in formulating his mental RFC because he relied on the opinion of State agency consultant Dr. Howard Tin, Psy.D. Plaintiff asserts the ALJ should not have relied on Dr. Tin's mental RFC assessment because he did not consider Plaintiff's treatment with a therapist and did not have the opportunity to review medical

6

evidence submitted after he formulated his opinion which evidenced severe symptoms of depression and chronic post-traumatic stress disorder ("PTSD").

Plaintiff also argues the ALJ improperly developed the record in formulating his physical RFC because he relied on the opinions of State agency consultants Dr. Frank Mikell and Dr. Lenore Gonzalez. Plaintiff asserts the ALJ should not have relied on their opinions because they failed to cite to the results of his September 19, 2017 chest X-ray evidencing the presence of bullet fragments over his chest and right lung, and did not have the opportunity to review medical evidence submitted after they formulated their opinions which documented new diagnoses of chronic pain due to trauma and mild-to-moderate facet arthropathy.

Plaintiff contends the opinions of Dr. Tin, Dr. Mikell, and Dr. Gonzalez were outdated as a result of subsequent mental and physical diagnoses; therefore, the ALJ should have ordered an updated consultative examination.

In formulating Plaintiff's RFC, the ALJ first considered the hearing testimony. Tr. 16. Plaintiff testified he was unable to work because of pain related to gunshot wounds, depression, and anxiety. *Id*. Plaintiff reported he was 5'11" and approximately 230 pounds. Tr. 16, 44. He explained he was shot in 1993 and again in 2014, with the latter incident resulting in a lacerated liver and damaged pancreas. Tr. 16, 42-43. Plaintiff stated he has bullet fragments around his spinal cord and chest cavity from the first shooting. Tr. 51-52. Plaintiff indicated he wears a brace on his right hand due to right side neuropathy. Tr. 16, 44. Plaintiff moved from Illinois to Missouri in June of 2019 which caused him to lose his home health aide and, at the time of the hearing, was waiting for his Medicaid to be reinstated. Tr. 16, 53. Plaintiff testified his daughter assists him with household chores. Tr. 16, 50. Plaintiff did not have a driver's license, but this was due to unpaid traffic tickets. Tr. 14, 38-39. As to his mental disorders, Plaintiff explained he

has difficulty trusting people and does not leave his mother's house where he resides. Tr. 16, 39, 47.

After considering the hearing testimony, the ALJ reviewed the medical evidence pertaining to Plaintiff's physical impairments. Tr. 16-17. The earliest treatment notes in the record are dated April 23, 2017, prior to his alleged onset date. Tr. 17, 321-31, 410-23, 457-71. Plaintiff appeared at Memorial Hospital in Belleville, Illinois complaining of facial lacerations resulting from his involvement in a physical altercation. *Id.* The ALJ found it relevant that Plaintiff denied neck pain, numbness, or tingling; exhibited nontender extremities and normal range of motion; had unremarkable chest, respiratory, abdomen, neurological, back, and neck examinations; and computed tomography revealed a normal cervical spine. *Id*. During the visit, Plaintiff reported he did not have a primary care physician ("PCP"). Tr. 325. Plaintiff returned to Memorial Hospital on May 1, 2017, for suture removal, and the records again reflected a normal physical examination. Tr. 17, 332-34, 489-93.

On August 10, 2017, Plaintiff appeared to Memorial Hospital with complaints of nausea. Tr. 17, 335-47, 397-09, 495-02. Plaintiff reported he was employed at that time. *Id.* His Body Mass Index ("BMI") was 30.1, which qualified him as obese. Tr. 17, 341-42. The ALJ noted his physical examination was normal with no reports of musculoskeletal, neurologic, or respiratory symptoms. Tr. 17, 335-37. A CT Scan of his abdomen and pelvis revealed "[n]o acute abnormality to account for [his] symptoms" with "[m]inimal degenerative changes seen in the spine." Tr. 17, 339, 346, 506. Plaintiff was directed to avoid alcohol, caffeine, and fried foods, and to follow up with a PCP. Tr. 17, 340, 503-04.

On September 19, 2017, Plaintiff appeared to the Southern Illinois Healthcare Foundation ("SIHF") to establish a PCP. Tr. 17, 440-42, 616-18. Plaintiff reported a recent onset of dizziness

8

and difficulty breathing. Tr. 617. Other than finding a tender lump in the middle of his back, the physical examination was normal. Tr. 17, 618. A radiological exam of his chest revealed metallic bullet fragments but there was no evidence of acute cardiopulmonary abnormality. Tr. 17, 349, 450, 520, 632. A September 22, 2017 ultrasound of the chest was negative for masses. Tr. 18, 448, 521-22, 630.

On October 24, 2017, Plaintiff appeared to Memorial Hospital with complaints of back pain resulting from lifting heavy objects at work as a packer. Tr. 18, 523-35. Lumbar spine X-rays were unremarkable, with no spondylosis, well preserved vertebral body heights and intervertebral disc spaces, and no fracture, subluxation, or facet dislocation. Tr. 18, 447, 530, 629. Plaintiff was discharged with instructions to follow up with his PCP, visit a pain management specialist, use a heating pad for low back discomfort, and avoid strenuous heavy lifting or twisting and turning while holding heavy items. Tr. 526-27. He was also provided with a "small prescription" for Valium and NSAIDs. *Id.*

On October 25, 2017, the date of his alleged disability onset, Plaintiff called his recently established PCP to obtain referrals for physical therapy and pain management. Tr. 18, 443, 622. On October 30, 2017, Plaintiff appeared for a follow up appointment at SIHF with complaints of neck, chest wall, and lower back pain, which he attributed to the bullet fragments in his chest. Tr. 18, 437-39, 611-13. Despite his reports of tenderness in the cervical and right lumbar area, a physical examination revealed normal motor, strength, tone, and movement of all extremities. *Id.*

On November 1, 2017, Plaintiff attended his first physical therapy session. Tr. 18, 350, 536-42. Treatment notes indicate his diagnosis to be cervicalgia. *Id.* Plaintiff reported his overall pain intensity to be 5 out of 10, attributing 5 to chest pain, 0 to back pain, and 3 to neck pain. Tr. 18, 350-51. Plaintiff stated he recently lost his job due to an inability to keep up with the work

but confirmed he could perform all activities of daily living, although he needed to modify them, as necessary, due to pain. *Id.* On examination, Plaintiff had some muscle tightness and reduced range of motion, but he exhibited nearly full shoulder and hip strength. *Id.* The record reflects Plaintiff regularly attended physical therapy sessions and completed the referral by the end of 2017. Tr. 18, 350-94, 543, 547-60, 580-83.

On December 8, 2017, Plaintiff appeared to SIHF to discuss medication options for pain relief. Tr. 18, 435, 656-58, 608-10. Plaintiff felt as if the physical therapy was ineffective, and his current prescriptions, Tramadol and Baclofen, made him tired. *Id.* Plaintiff complained of constant tingling and numbness from his neck to his right index and second finger. *Id.* Treatment notes indicated he ambulated normally. *Id.* Plaintiff was prescribed Acetaminophen. Tr. 18, 436. A CT scan of the cervical spine revealed no evidence of a fracture, dislocation or bone destruction, no soft tissue swelling, no acute findings, and no significant neural compromise. Tr. 18, 563, 627, 668. A CT scan of the lumbar spine revealed mild osteoarthritic change in the facet joints, no evidence of fracture, dislocation or bone destruction, and no soft tissue swelling. Tr. 18, 564, 628, 669. Plaintiff's diagnoses were listed as cervicalgia and cervical radiculopathy. Tr. 18, 436.

On December 18, 2017, a chest X-ray was ordered due to his complaints of a cough and left-sided chest pain. Tr. 18, 565-73. The imaging revealed "unchanged" bullet fragments overlying the right lung, clear lungs, no pleural effusion, no pneumothorax, no acute consolidation, and normal cardiomediastinal silhouette. Tr. 18, 573, 626, 667. The ALJ noted the recommended treatment for his physical complaints continued to be conservative. Tr. 18. The ALJ further noted Plaintiff reported he liked to walk as an activity. Tr. 19, 620. On December 22,

2017, he was prescribed Amitriptyline/Elavil for low back pain attributed to neuropathy. Tr. 605-07, 653-55.

On April 20, 2018, Plaintiff appeared to SIHF seeking new pain medication and reported that Tylenol was ineffective. Tr. 19, 596-98, 644-46. Plaintiff again complained of tingling and numbness. *Id.* A physical examination, however, rendered unremarkable results, including normal movement of all extremities and a normal gait. Tr. 19, 598, 646. Plaintiff was advised "to pick up prescription for [E]lavil 25mg at his pharmacy as this was prescribed back in [D]ecember for his neuropathy pain." *Id.* It is unclear from the records why Plaintiff did not pick up this medication four months prior, or what effect not taking his prescribed medication had on his symptoms.

On May 31, 2018, Plaintiff appeared to the emergency room of Memorial Hospital with complaints of a severe headache with photophobia, phonophobia, vomiting, and blurred vision. Tr. 19, 676-92. A physical examination revealed no evidence of head trauma. Tr. 19, 679. A CT scan showed normal results with no abnormalities. Tr. 19, 665-66, 691. On June 15, 2018, Plaintiff appeared for a follow up visit at SIHF with continued complaints of a severe headache and elevated blood pressure. Tr. 19, 641. During this visit, Plaintiff denied numbness, weakness, tingling, or chest pain. Tr. 19, 642. Treatment notes recorded his weight as 223 pounds with a BMI of 30.8. Tr. 19, 638, 641-42. Plaintiff was instructed to follow up in one month for a blood pressure recheck. Tr. 643. The ALJ again noted his treatment plan was conservative. Tr. 19.

On August 28, 2018, Plaintiff appeared to an interventional pain medicine clinic upon his PCP's referral. Tr. 19, 770-86. Plaintiff described his pain as constant, aching, dull, and throbbing, which worsened with increased activity and standing. Tr. 770. A physical examination revealed mild pain with extension and right rotation of cervical spine and tenderness at

11

paraspinal muscles. Tr. 19, 771. Otherwise, Plaintiff exhibited normal examination results, including 5/5 extremity strength and the ability to heel walk and toe walk. *Id*. Plaintiff requested medical marijuana, but his provider opted to prescribe him Neurontin and Mobic. Tr. 19, 772. Injections for pain relief were recommended, but Plaintiff refused. *Id*.

On September 11, 2018, Plaintiff reported that his pain medication allowed him "to be somewhat functional and active." Tr. 790. On November 7, 2018, Plaintiff indicated "his pain [wa]s relieved by 60% by taking medications." Tr. 19, 797. He also reported his current pain level was 4 out of 10 and had improvement in performing daily activities. *Id.* A physical examination showed no change from his August 28, 2018 visit. Tr. 798. The ALJ noted Plaintiff's continued unwillingness to try injections for pain relief, or to resume physical therapy, both of which were repeatedly recommended by his treating providers. Tr. 19, 822-23, 827, 845, 864. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (failure to follow a recommended course of treatment weighs against a claimant's credibility). On January 31, 2019, February 14, 2019 and May 24, 2019, SIHF records indicated that Plaintiff exhibited normal ambulation, gait, and movement of all extremities despite his reports of continued back pain. Tr. 711, 724, 727-28.

After reviewing and summarizing the medical records associated with Plaintiff's physical impairments, the ALJ then turned to his mental health records. Tr. 19-23. SIHF treatment records listed March 6, 2018, as the date of onset for his major depressive and anxiety disorder. Tr. 20, 638, 641, 659, 705, 713, 727, 752, 756. The ALJ wrote that prior to March 6th Plaintiff denied psychiatric symptoms. Tr. 20. *See, e.g.*, Tr. 322, 332, 336, 398, 410, 414, 462, 753. The Court notes, however, Plaintiff's first report of depression was actually on February 9, 2018, but it was

described, at that time, as a "single episode." Tr. 602-04, 650-52. On the February 9th visit, Plaintiff was prescribed Zoloft, or Sertraline, for depression treatment. Tr. 604.

On March 6, 2018, Plaintiff appeared to SIHF for an appointment with a therapist due to moderate anxiety, severe depression, and difficulties sleeping. Tr. 20, 619-20, 662-64. Plaintiff reported he felt anxious in crowds secondary to being shot twice and often felt bad about his inability to do things he used to do. Tr. 20, 620-21, 663-64. A mental status exam described him as well-groomed, clean, cooperative, calm, oriented to situation, with a sad mood, and no hallucinations or suicidal ideations. *Id.* Plaintiff expressed feeling "sluggish" from Zoloft and reported that he stopped taking it for that reason. Tr. 620. His therapist referred him back to his PCP to discuss alternative medication options. *Id.*

On March 9, 2018, Plaintiff returned to his PCP. Tr. 20, 599-01, 647-49. Due to Plaintiff's reports of feeling "zombie-like," the Zoloft prescription was discontinued and substituted with Fluoxetine. Tr. 20, 601, 649. On May 4, 2018, Plaintiff visited with a social worker at SIHF, and he expressed feeling bad about being unable to work. Tr. 659-61. The social worker suggested he try vocational rehabilitation, but Plaintiff replied, "it's not gonna work." Tr. 661. On September 21, 2018, Plaintiff was diagnosed with chronic PTSD. Tr. 20, 702.

The ALJ noted Plaintiff received conservative treatment for his physical and mental health impairments, did not require surgery or hospitalization throughout the relevant period, was not directed by a treating physician to wear a brace for his neuropathy, and was fully ambulatory. Tr. 20-21. The ALJ found that Plaintiff's activities of daily living were not as limited as Plaintiff alleged, and his employment history demonstrated "short-time employment with some periods of incarceration indicat[ing] there may be reasons other than his health for his current lack of employment." Tr. 21. The Court notes that within the record is a summary of Plaintiff's earnings

13

from 1982 to 2017. *See* Tr. 179. Plaintiff's total documented lifetime income is approximately $32,000. *Id.* The record further evidences significant gaps in employment, as indicated by the ALJ.

The ALJ then considered four assessments and a Psychological Examination report submitted by State agency consultants. On March 2, 2018, agency consultant Donald Henson, Ph.D. submitted a mental medical evaluation. Tr. 21, 69-70, 72-74. Dr. Henson found Plaintiff to have mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others, concentrating, persisting, or maintaining pace; and moderate limitations in adapting or managing himself. Tr. 21, 69. Dr. Henson opined Plaintiff's symptoms of depression and anxiety would not prevent him from performing simple routine activities in a relatively low stress environment. Tr. 21, 74. The ALJ found Dr. Henson's opinion to be persuasive, but disagreed with his "finding of moderate limitation to adapting or managing self because it [was] not consistent with the full record that show[ed] the claimant ha[d] only mild limitation in adapting or managing self." Tr. 21-22.

On July 3, 2018, a second mental medical evaluation was performed by agency consultant Howard Tin, Psy.D. Tr. 22, 87-89, 92-95. Dr. Tin found Plaintiff to have mild limitations in understanding, remembering, or applying information; mild limitations in adapting or managing himself; and moderate limitations in interacting with others, concentrating, persisting, or maintaining pace. Tr. 22, 87. Dr. Tin opined Plaintiff was able to perform one and two step tasks. Tr. 22, 95. Similar to Dr. Henson, he also found Plaintiff capable of "performing simple routine activities in a relatively low stress environment" with "few social demands." Tr. 22, 94. The ALJ determined Dr. Tin's findings were persuasive because they were well supported by a narrative explanation and consistent with the evidence of record.

On March 12, 2018, agency consultant Dr. Frank Mikell submitted a physical medical evaluation. Tr. 22, 71-72, 75-76. Dr. Mikell determined Plaintiff was capable of performing medium, unskilled work despite his soft tissue injury. Tr. 22, 75. Dr. Mikell opined that Plaintiff was able to occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about 6 hours in an 8-hour workday; and push and/or pull without limitation. Tr. 22, 71-72. In formulating this opinion, Dr. Mikell pointed to the medical record evidencing normal gait, normal strength, and "no indication of bullet fragmentation in medical imaging as [Plaintiff] alleged." Tr. 72.

The ALJ explicitly considered the fact that after Dr. Mikell submitted his assessment, Plaintiff's medical record expanded to include the onset of severe migraines and obesity. Tr. 22. To account for these additional impairments, the ALJ referred to the July 3, 2018 physical RFC assessment of non-treating State agency consultant Dr. Lenore Gonzalez. Tr. 22, 90-92, 95-97. Dr. Gonzalez opined Plaintiff's medical record evidenced that his headaches were controlled with medication. Tr. 22, 90-92. Dr. Gonzalez considered his increased BMI of 30.8 and assessed Plaintiff's RFC to be the same as Dr. Mikell's with an additional limitation to avoid concentrated exposure to noise. Tr. 22, 91. The ALJ found Dr. Gonzalez's opinion to be persuasive.

Lastly, the ALJ considered the February 26, 2018 Psychological Examination report from examining consultant and Clinical Psychologist, Megan Keyes, Ph.D. Tr. 22-23, 584-88. The mental status exam described Plaintiff as appearing with adequate hygiene and grooming; normal motor activity and good eye contact; alert, cooperative, and coherent; a dysphoric mood with congruent affect; and oriented to person, place, and time. Tr. 566-87. Plaintiff reported he lived with a "good friend" in her apartment, was able to manage his own finances, and could perform a range of household chores, including cooking, cleaning, laundry, and shopping with limited

15

carrying and lifting. Tr. 587. Dr. Keyes opined that Plaintiff had no limitation in his ability to

understand, remember, or apply information; no limitation in his ability to interact with others;

mild limitations in his ability to concentrate, persist, or maintain pace; and moderate limitations

in his ability to adapt and manage himself. Tr. 22-23, 588. Dr. Keyes noted that Plaintiff's

"prognosis [wa]s poor with the current level of treatment as he reported his current psychiatric

medications [were] ineffective in reducing his depressive or anxiety symptoms." Tr. 588. The

ALJ found this report to be helpful, but not persuasive, because her conclusions were primarily

based on Plaintiff's subjective reports. Tr. 23. The ALJ disagreed with her opinions that Plaintiff

had a moderate limitation to adapting or managing himself and no limitation in understanding,

remembering, or applying information and in interacting with others. *Id.*

### 1. Development of the Record as to Plaintiff's Mental Impairments

Plaintiff argues the ALJ improperly developed the record in formulating his mental RFC

by relying on the outdated opinion of State agency consultant Dr. Tin. Plaintiff asserts the ALJ

should not have relied on Dr. Tin's July 3, 2018 opinion because he did not consider the fact that

Plaintiff was treated with a therapist and did not have the opportunity to review medical evidence

submitted post-assessment evidencing severe symptoms of depression and chronic PTSD. The

Court agrees.

An ALJ has a duty to fully develop the record, but this duty only arises if a crucial issue

is undeveloped. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). In some cases, this duty

requires the ALJ to obtain additional medical evidence, such as a consultative examination of the

claimant, before rendering a decision. *See* 20 C.F.R. § 404.1519a(b). This duty is not "never-

ending," and an ALJ is not required to disprove every possible impairment. *Barret v. Shalala*, 39

F.3d 1019, 1023 (8th Cir. 1994). The ALJ is required to order medical examinations and tests

only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled. *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). Social Security regulations do not require the ALJ to order a consultative evaluation of every alleged impairment but does grant the ALJ authority to do so if the existing medical sources do not contain sufficient evidence to make a determination. *See Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989). "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (citing *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993)). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

In the instant case, on March 2, 2018, Dr. Henson formulated a mental RFC assessment. Tr. 21, 69-70, 72-74. On March 6, 2018, Plaintiff appeared to SIHF for his first appointment with a therapist due to moderate anxiety, severe depression, and difficulties sleeping. Tr. 20, 619-20, 662-64. Around this time, Plaintiff was prescribed medication to manage his symptoms of depression. Tr. 20, 601, 604, 649. On July 3, 2018, Dr. Tin submitted a second mental RFC assessment. Tr. 22, 87-89, 92-95. Both agency consultants determined Plaintiff was capable of performing medium work, which the ALJ found persuasive and consistent with the record.

As Plaintiff argues, the underlying medical record contains treatment notes which were not considered by Dr. Henson or Dr. Tin because they were submitted subsequent to the formulation of their assessments. Specifically, on September 21, 2018, Plaintiff was diagnosed with chronic PTSD. Tr. 20, 702. Treatment notes from SIHF, dated January 22, 2019 to May 13,

2019, document Plaintiff's regular sessions with a social worker and a therapist for his symptoms related to major depressive disorder and chronic PTSD. Tr. 704-68.

On January 22, 2019, Plaintiff visited with Cynthia Riewski, LCSW and reported having an onset of nightmares in which he would dream about killing people. Tr. 740. During this visit, he was referred to a therapist specializing in eye movement desensitization and reprocessing. *Id.* On January 29, 2019, Plaintiff saw psychiatrist, Dr. Gopinath Gorthy, in which she encouraged him to continue with psychotherapy. Tr. 757-58. On March 12, 2019, a mental status exam described his affect as congruent to thought content and sad with fair insight and judgment. Tr. 736. During this visit, Plaintiff continued to report the occurrence of disturbing dreams. *Id.*

On April 10, 2019, Plaintiff was described as "very depressed." Tr. 732. Treatment notes indicated he was recently approved for home help services. *Id.* On April 12, 2019, a physical examination revealed the presence of auditory hallucinations with an angry, sad, and expansive affect. Tr. 748. Although he was deemed safe to continue out-patient treatment without hospitalization, Plaintiff was advised to call 911 or go to the emergency room if he experienced suicidal or homicidal thoughts. Tr. 750. On May 13, 2019, Plaintiff's behavior was described as hyperactive and agitative with a continued presence of auditory hallucinations. Tr. 744. Plaintiff's insight and judgment were impaired, and he exhibited an angry, sad, and expansive affect. *Id.*

When Dr. Tin formulated his July 3, 2018 mental RFC assessment, Plaintiff had not yet been diagnosed with chronic PTSD, and Dr. Tin did not have the opportunity to review subsequently submitted SIHF therapy records describing what appears to be a significant decrease in his mental status. Dr. Tin found Plaintiff to have "some symptoms of depression and anxiety secondary to his medical condition *without* any psychiatric/psychological treatment[.]"

Tr. 94 (emphasis added). Thus, Dr. Tin found it relevant to his assessment that Plaintiff had not received psychiatric treatment. *Id.* Although Plaintiff subsequently underwent psychotherapy, the ALJ determined Dr. Tin's opinion was "persuasive" and "consistent with the evidence." *See* Tr. 22. The Court finds the ALJ's reliance on Dr. Tin's RFC assessment to be reversible error as Dr. Tin's assessment was based, in part, on Plaintiff's lack of psychiatric treatment, which he later obtained in 2019. The Court reaches the same conclusion with respect to the ALJ's reliance on Dr. Henson's March 2, 2018 consultative mental medical evaluation.

"[T]he opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records, including relevant medical records made after the date of evaluation." *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011) (citing *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)). Here, Dr. Tin based his July 2018 mental assessment on an incomplete medical record because, at that time, Plaintiff had undergone very minimal mental health treatment. Between the date of Dr. Tin's evaluation and the ALJ's decision, however, Plaintiff received regular psychotherapy treatment for severe depression, was diagnosed with chronic PTSD, began experiencing auditory hallucinations, and experienced increased symptoms despite medication compliance. The ALJ did not explain how Dr. Tin's opinion was consistent with Plaintiff's therapy records, and it appears from the Court's review that they are not. Moreover, the Court notes that although the ALJ acknowledged Plaintiff's September 2018 diagnosis of chronic PTSD in his RFC determination, he did not discuss the impact of the January 22, 2019 to May 13, 2019 SIHF therapy records on Plaintiff's ability to work.

Within the records Dr. Tin did not review, Plaintiff presented a substantial deterioration of symptoms by reporting reoccurring dreams of killing others, had abnormal mental status

examinations, exhibited auditory hallucinations, and experienced increased symptoms despite medication compliance. *See Perry C. v. Comm'r of Soc. Sec.*, No. 19-CV-0772-MWP, 2021 WL 456912, at *6 (W.D.N.Y. Feb. 9, 2021) (records showing a substantial deterioration of symptoms after an RFC assessment is completed warrants remand to allow the ALJ to obtain a more current medical assessment of plaintiff's functional capacity related to such impairments).

The Court finds the ALJ's disability determination as to Plaintiff's mental impairments was not supported by substantial evidence in the record as a whole. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). "This is particularly true [when] . . . the state agency psychological consultant rendered his opinion years earlier and, therefore, did not have access to numerous and significant medical records created thereafter." *Doshie v. Saul*, No. 4:18-cv-876-PLC, 2019 WL 4059899, at *14 (E.D. Mo. Aug. 28, 2019). "[A]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016)).

Plaintiff's new diagnosis of chronic PTSD, increased symptoms, including auditory hallucinations, and regular psychological treatment presented an ambiguity in the record concerning the continued applicability of the RFC assessment rendered by Dr. Tin as to Plaintiff's mental abilities. *See* 20 C.F.R. § 416.919a(b)(4) (providing a consultative examination may be required when "[t]here is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established").

20

On remand, the ALJ should seek an updated mental RFC assessment regarding how Plaintiff's chronic PTSD diagnosis and resulting symptoms as documented in his therapy records affects his RFC, if at all, which was not a consideration included in Dr. Tin's July 2018 consultative examination. The ALJ should then re-assess Plaintiff's RFC in light of all relevant, credible evidence in the record as a whole.

### 2. Development of the Record as to Plaintiff's Physical Impairments

Plaintiff argues the ALJ erred by finding the State agency consultative examiner opinions of Dr. Mikell and Dr. Gonzalez persuasive because they incorrectly wrote in their evaluations that "there [was] no indication of bullet fragmentation in medical imaging as alleged." *See* Tr. 72, 91. Plaintiff points to his September 19, 2017 X-ray which indicates the presence of metallic bullet fragments in his chest area. *See* Tr. 632. Plaintiff asserts their oversight impacted the RFC assessments.

While the Court agrees with Plaintiff that Drs. Mikell and Gonzalez incorrectly noted in their assessments that there was no indication of bullet fragmentation in his medical imaging, Tr. 72, 91, the ALJ cited to and considered records indicating that there were, in fact, bullet fragments overlying Plaintiff's chest and lungs. *See* Tr. 17. For example, despite the September 19, 2017 X-ray finding the presence of metallic bullet fragments, the ALJ noted that the results of the imaging revealed no evidence of an acute cardiopulmonary abnormality. Tr.17, 349, 396, 450, 520. On December 18, 2017, a two-view examination of the chest revealed "unchanged" bullet fragments overlying the right lung with an otherwise clear chest and normal imaging. Tr. 573. On February 7, 2019, an updated chest scan indicated the presence of metallic foreign bodies over the right chest but described Plaintiff's condition as "stable." Tr. 765. Nowhere in the record does a treating physician express concern with the presence of the fragments in his

body or recommend surgical removal. Moreover, as the ALJ noted throughout the opinion, Plaintiff's treatment for pain attributable to the fragments was conservative, and his physical examinations consistently revealed normal results.

The Court cannot find the ALJ erred in declining to obtain an updated medical consultant opinion based on the failure of Dr. Mikell and Dr. Gonzalez to acknowledge the bullet fragments present in Plaintiff's chest. The substantial evidence of the record as a whole shows the stable nature of the foreign bodies. There is no reason to believe a consultant's citation to the September 19, 2017 radiology report would have resulted in the finding of a greater impairment. Therefore, it was reasonable, and within the ALJ's discretion, to not seek an additional consultative examination for the purpose of evaluating one record, which the ALJ did consider in her determination. *See Martin v. Colvin*, 2015 WL 331186, at *6 (S.D. Ind. Jan. 21, 2015) (failure of state reviewer to consider a specific medical record was not error where the ALJ discussed that record in the opinion).

Plaintiff additionally argues the ALJ erred by failing to obtain an updated consultative examination to evaluate his physical impairments because he was diagnosed with chronic pain due to trauma and mild-to-moderate facet arthropathy after Dr. Mikell and Dr. Gonzalez submitted their March 12, 2018 and July 3, 2018 RFC evaluations. In support, Plaintiff points to a September 28, 2018 record by his interventional pain medicine doctor, Dr. Nasheed Bashir, who diagnosed him with chronic pain after traumatic injury, Tr. 787-90, as well as a February 7, 2019 CT scan of his abdomen and pelvis revealing "mild to moderate facet arthropathy." Tr. 763-64.

Unlike Plaintiff's diagnosis of chronic PTSD in which Dr. Tin did not have the opportunity to consider subsequent psychotherapy and social work notes reflecting a significant

decrease in Plaintiff's symptoms and the commencement of new treatment, Dr. Mikell and Dr.

Gonzalez had the opportunity to review substantial evidence regarding Plaintiff's persistent

complaints of chronic pain due to a history of gunshot wounds. The record does not reflect

Plaintiff's symptoms worsened post-diagnosis in such a way that it would have affected Dr.

Mikell or Dr. Gonzalez's RFC assessments.

The ALJ considered every radiological examination in the record which repeatedly

revealed mild or normal results; conservative physical therapy and medication treatment;

numerous physical examinations showing normal strength, gait and ambulation; Plaintiff's

ability to perform daily activities of living; and Plaintiff's inconsistent employment history. The

ALJ also considered Plaintiff's refusal to receive recommended injection therapy for pain relief

and declined to participate in additional physical therapy and vocational rehabilitation. The Court

notes the ALJ's opinion is approximately sixteen pages and cites to almost every one of

Plaintiff's treatment notes in the record relating to his physical impairments and complaints of

pain. Significantly, his treating provider, Dr. Bashir, described his arthropathy as "mild," and

treatment records did not reveal a decrease in his symptoms post-diagnosis. Tr. 771, 778, 798,

844, 863,

"Failing to develop the record is reversible error when it does not contain enough

evidence to determine the impact of a claimant's impairment on his ability to work." *Byes v.*

*Astrue*, 687 F.3d 913, 916 (8th Cir. 2012). "The ALJ is required to order medical examinations

and tests only if the medical records presented to him do not give sufficient medical evidence to

determine whether the claimant is disabled." *McCoy*, 648 F.3d at 612 (citing *Conley*, 781 F.2d at

146); *see also Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000) ("'[I]t is reversible error for

an ALJ not to order a consultative examination when such an evaluation is necessary for him to

make an informed decision.'") (quoting *Reeves v. Heckler,* 734 F.2d 519, 522 n.1 (11th Cir. 1984)). Therefore, "[a]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). Here, the record is replete with evidence regarding Plaintiff's physical impairments related to the history of his gunshot wounds, which the ALJ thoroughly cited to and considered. Thus, the physical component of the RFC assessment is supported by substantial evidence in the record as a whole.

In re-assessing Plaintiff's mental RFC on remand, however, the ALJ must consider the combined effect of both the mental and physical impairments. *See* 20 C.F.R. § 404.1523 ("[W]e will consider the combined effect of all of your impairments . . . the combined impact of the impairments will be considered throughout the disability determination process"); *Scott v. Astrue*, No. 4:11-CV-295-AGF, 2012 WL 4479128, at *21 (E.D. Mo. Sept. 28, 2012) (remanding for the ALJ to consider the combined effect of the plaintiff's mental and physical impairments even where the evidence arguably supported the ALJ's RFC assessment with respect to the plaintiff's physical impairments). Therefore, the ALJ will be required to re-evaluate Plaintiff's physical RFC in combination with Plaintiff's mental RFC.

**B. Evaluation at Step Two**

Plaintiff argues the ALJ committed reversible error by failing to consider Plaintiff's diagnoses of chronic pain after traumatic injury and mild-to-moderate facet arthropathy at Step Two. The Court cannot agree.

At Step Two of the five-step sequential evaluation used to determine whether a claimant is disabled, the ALJ must determine whether the claimant has a "severe" impairment which lasted or is expected to last for at least twelve months. *See* 20 C.F.R. §§ 404.1509, 416.909. To

show that an impairment is severe, a claimant must show that he has (1) a medically
determinable impairment or combination of impairments, which (2) significantly limits his
physical or mental ability to perform basic work activities, without regard to age, education, or
work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 404.1521(a), 416.920(a)(4)(ii), (c);
416.921(a).

      "An impairment is not severe if it amounts only to a slight abnormality that would not
significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v.
Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Basic work activities are those "abilities and aptitudes
necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b), 416.922. While the
requirement of severity is "not a toothless standard," neither is it an "onerous requirement."
*Kirby*, 500 F.3d at 707. Additionally, though it is the claimant's burden to prove the existence of
severe impairments, "the burden of a claimant at this stage of the analysis is not great." *Caviness
v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

      Courts have held an error at Step Two may be harmless if the ALJ nonetheless
considered all of a plaintiff's impairments, severe and non-severe, in his or her subsequent
analysis. *See Spainhour v. Astrue*, No. 11-1056-SSA-CV-W-MJW, 2012 WL 5362232, at *3
(W.D. Mo. Oct. 30, 2012) ("[E]ven if the ALJ erred in not finding plaintiff's shoulder injury and
depression to be severe impairments at step 2, such error was harmless because the ALJ clearly
considered all of plaintiff's limitations severe and nonsevere in determining plaintiff's RFC.");
*see also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("If you have more than one impairment.
We will consider all of your medically determinable impairments of which we are aware,
including your medically determinable impairments that are not 'severe,' as explained in §§
404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity.").

Here, at Step Two of the sequential evaluation, the ALJ determined Plaintiff's "history of gunshot wounds" to constitute a severe impairment. Tr. 12. A careful review of the ALJ's decision shows the subsequent analysis considered Plaintiff's symptoms attributable to his history of gunshot wounds. Such symptoms included Plaintiff's diagnosis of chronic pain after traumatic injury and the February 7, 2019 CT scan of his abdomen and pelvis revealing mild to moderate facet arthropathy, both of which relate to and are intertwined with his history of gunshot wounds. *See Bryant v. Astrue*, 4:12-cv-177-SPM, 2013 WL 571761, at *4 (E.D. Mo. Feb. 13, 2013) ("ALJ's failure to find a particular impairment severe does not require reversal where the ALJ considers all of a claimant's impairments, severe and non-severe, in his or her subsequent analysis").

The Court further finds the ALJ's determination of a history of gunshot wounds as a severe impairment allowed the ALJ to properly evaluate the effects of such a history, which necessarily included chronic pain from traumatic injury and mild-to-moderate arthropathy. *See, e.g., Herd v. Colvin*, No. 6:14-CV-03433-NKL, 2015 WL 3717473, at *7 (W.D. Mo. June 15, 2015) (finding no error when a plaintiff fails "to show how a diagnosis of personality disorder is so different from the mental disorders fully considered by the ALJ that a different outcome or different RFC would have occurred").

Even if the ALJ technically erred in not explicitly including chronic pain after traumatic injury or mild-to-moderate facet arthropathy in Step Two, given the ALJ's inclusion and discussion of these diagnoses in her subsequent analysis and their close relationship to Plaintiff's severe impairment of a history of gunshot wounds, the ALJ's failure to include them at Step Two was, at most, a harmless error. *See, e.g., Maziarz v. Secretary of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Lorence v. Astrue*, 691 F. Supp.2d 1008, 1028 (D. Minn. 2010).

Accordingly, Plaintiff's claim that the ALJ's decision should be reversed on account of the ALJ's failure to consider chronic pain after traumatic injury and mild-to-moderate arthropathy at Step Two of the sequential analysis will be denied.

## V.   Conclusion

After carefully reviewing the record as a whole, the Court finds the administrative record is not sufficiently developed as to Plaintiff's mental impairments to make a determination as to his disability. *See Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994) (determination of when the Commissioner has failed to develop the record is made on a case-by-case basis). In re-assessing Plaintiff's mental RFC on remand, the ALJ must consider the combined effect of both the mental and physical impairments. *See* 20 C.F.R. § 404.1523. This case is remanded for further development of the record as set forth herein.

Accordingly,

**IT IS HEREBY ORDERED** the decision of the Commissioner of Social Security is **REVERSED,** and this case is **REMANDED** under 42 U.S.C. 1383(c)(3) and Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

**IT IS FURTHER ORDERED** the Clerk of Court shall substitute Kilolo Kijakazi for Andrew M. Saul in the court record of this case.

So Ordered this 21st day of September, 2021.


*/s/ Stephen R. Welby*
STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE